No. A-CV-11-93

# Supreme Court of the Navajo Nation

---

**Thomas Largo, Gary Miller, and Roy Largo,
Petitioners-Appellees,**

v.

**Gregory & Cook, Inc., Respondent-Appellant.
Decided February 17, 1995**

---

## OPINION

Before YAZZIE, Chief Justice, AUSTIN and TOLEDO* (sitting by designation), Associate Justices.

Karen L. Townsend, Esq., Farmington, New Mexico, for the Appellant; and Earl Mettler, Esq., Albuquerque, New Mexico, for the Appellees.

Opinion delivered by AUSTIN, Associate Justice.

This is a direct appeal from a decision of the Navajo Nation Labor Commission. At issue is the Commission's application of the 1990 Amendments to the Navajo Preference in Employment Act.[1]

## I. FACTS

Gregory and Cook, Inc., (G&C) is a pipeline construction contracting company. Throughout 1991 and 1992, G&C performed construction projects within the boundaries of the Navajo Nation for both Transwestern Pipeline Company (Transwestern) and El Paso Natural Gas Company (El Paso). On January 21, 1992, G&C and El Paso entered into a Settlement Agreement with the Navajo Nation regarding work to be done on the San Juan Triangle Expansion, project 9109, for El Paso. This dispute arose under that contract.

In the Settlement Agreement, G&C agreed to fully comply with Navajo law, including the Navajo Preference in Employment Act (NPEA). In order to comply with the NPEA, G&C agreed not to hire non-Navajos to work on project 9109 within the geographical jurisdiction of the Navajo Nation, "so long as the applications of potentially qualified Navajos [had] been received." G&C further agreed to hire a Coordinator to accept applications for employment on project 9109, to monitor the progress of those applications, and to provide the Office of Navajo Labor Relations with a weekly report on the status of every application received.

---

1. This case is governed by the 1990 Amendments to the Navajo Preference in Employment Act. Because these Amendments have not yet been codified, we will cite to the sections as they appear in the Amendments. The Act is found at 15 N.T.C. § 610 *et seq*.

In order to complete project 9109, G&C needed to hire welders to work on pipeline welding crews. El Paso requires each welder to possess a valid El Paso Natural Gas Company Welding Certificate to qualify to work on El Paso pipeline projects. Welding applicants for project 9109 who were not certified by El Paso were required to take and pass an El Paso welding test. Therefore, applicants who had not yet been certified by El Paso were only potentially qualified candidates for employment on project 9109 until they had been given the welding test and had been found actually qualified or actually unqualified.

Thomas Largo, Gary Miller, and Roy Largo (Petitioners) are enrolled members of the Navajo Nation. Gary Miller was hired by G&C to work as a welder on a Transwestern project in late 1991.[2] On November 20 and December 20, 1991, Gary Miller took and failed the El Paso welding test. In early January, 1992, he was again hired by G&C for work on another Transwestern project. That project ended on January 26, 1992. Gary Miller then filed an application with G&C's Coordinator for a job on project 9109.

Thomas Largo was also hired by G&C to work on the Transwestern project in early January, 1992.[3] Like Gary Miller, Thomas Largo had taken and failed the El Paso welding test on November 20 and December 20, 1991. Also like Gary Miller, after the Transwestern job ended, Thomas Largo applied with G&C for a job on project 9109.

Roy Largo did not work for G&C on either Transwestern project. On November 20, 1991, Roy Largo took and failed the El Paso welding test. He did not retest in December. In late January, 1992, Roy Largo also applied with G&C for a job on project 9109.

In summary, by the end of January, 1992, each of the Petitioners had properly filed an application with G&C for employment on project 9109. Because none of the Petitioners had been certified by El Paso, each waited to be given the welding test, aware that he would not be hired until he took and passed that test. Time went by, however, and the Petitioners did not receive word as to when, or if, they would be tested.

Frustrated by this lack of response, each of the Petitioners went to G&C's yard in Farmington, New Mexico in February, 1992, in an effort to take the welding test. They were not tested. G&C began hiring welders for project 9109 in mid-February. All the welding positions were filled by March 5, 1992. Numerous non-Navajo welders were hired in February. The Petitioners' applications were on file with G&C before hiring began, yet they were not given an opportunity to take the welding test.

The Petitioners then complained to the Office of Navajo Labor Relations, and on March 18, 1992, the Petitioners were finally allowed to take the El Paso welding test. Each Petitioner passed the test. Accordingly, on March 18, 1992, all

---

2. Gary Miller was certified by Transwestern to work on three types of welding crews in late 1991.

3. At that time, Thomas Largo's "multiple qualification" certification qualified him to work on all Transwestern welding crews.

three Petitioners became qualified to work on project 9109. G&C refused to hire them, however, because all of the welding positions on the project had been filled. Welding work on project 9109 was completed on May 5, 1992. The Petitioners had not been hired.

The Petitioners filed a formal complaint against G&C and El Paso with the Office of Navajo Labor Relations in September, 1992. The complaint alleged in part that, by not employing the Petitioners as welders on project 9109, G&C had violated the NPEA. On December 18, 1992, a hearing on the issues was held by the Navajo Nation Labor Commission (Commission).

On March 15, 1993, the Commission ruled, in part, that by failing to hire the Petitioners once they had become qualified, G&C had not given the Petitioners the employment preference mandated by Section 4(A), (C) of the NPEA. *Largo, et al. v. Gregory & Cook, Inc.*, NNLC No. 92-006. The Commission awarded to the Petitioners, as damages, the amount of earnings that each Petitioner had lost as a result of not being employed on project 9109 from the date that he became actually qualified, until the date that the welding was completed. On April 19, 1993, the Commission denied the Petitioners' motion for an award of attorney's fees.

## II. ISSUES

The parties raise the following issues on appeal:

1. Whether the NPEA requires employers to hold jobs open until an applicant becomes qualified, when the applicant has previously demonstrated a lack of qualification.

2. Whether the Commission erred in failing to allow G&C a credit for wages earned elsewhere by Thomas Largo when the Commission allowed such a credit for Petitioners Gary Miller and Roy Largo.

3. Whether the Commission correctly denied the Petitioners' application for attorney's fees.

## III. DISCUSSION

### A. The Requirements of the NPEA.

The first issue is whether the NPEA requires an employer to hold a job open until a Navajo applicant who has been found unqualified for the position subsequently becomes qualified. We hold that the NPEA does not require such action.

Our decision on this issue is based both upon the purposes for which the NPEA was enacted and upon the wording of the statute itself. The purposes of the NPEA, as stated in Section 2, are as follows:

1. To provide employment opportunities for the Navajo work force;
2. To provide training for the Navajo people;
3. To promote the economic development of the Navajo Nation;

4. To lessen the Navajo Nation's dependence upon off reservation sources of employment, income, goods and services;
5. To foster the economic self-sufficiency of Navajo families;
6. To protect the health, safety and welfare of Navajo workers; and
7. To foster cooperative efforts with employers to assure expanded employment opportunities for the Navajo work force.

As enumerated, the first six statements emphasize the Navajo Nation's commitment to the prosperity and autonomy of the Navajo people. The seventh recognizes the importance of both Navajo and non-Navajo economic opportunities to the accomplishment of these goals.

In order to fulfill the stated purposes of the NPEA, Section 4(A) sets forth some specific guidelines that must be followed by all companies doing business within the boundaries of the Navajo Nation. Section 4(A) states:

> All employers doing business within the territorial jurisdiction of the Navajo Nation, or engaged in any contract with the Navajo Nation shall:
>
> 1. Give preference in employment to Navajos. Preference in employment shall include specific Navajo affirmative action plans and timetables for all phases of employment to achieve the tribal goal of employing Navajos in all job classifications....

Section 4(C) details the hiring and retention procedures that employers must follow to be in compliance with the NPEA. Section 4(C) states:

> Irrespective of the qualifications of any non-Navajo applicant or candidate, any Navajo applicant or candidate who demonstrates the necessary qualifications for an employment position:
>
> 1. Shall be selected by the employer in the case of hiring; ... and
>
> 2. Shall be retained by the employer in the case of a reduction-in-force affecting such class of positions until all non-Navajos employed in that class of positions are laid-off, provided that any Navajo who is laid-off in compliance with this provision shall have the right to displace a non-Navajo in any other employment position for which the Navajo demonstrates necessary qualifications.
>
> Among a pool of applicants or candidates who are solely Navajo and meet the necessary qualifications, the Navajo with the best qualifications shall be selected or retained, as the case may be.

Thus, the intent of the NPEA is to give qualified Navajos preference over qualified non-Navajos when employers fill and eliminate employment positions. The NPEA does not mandate that preference be given when a Navajo does not meet a position's minimum qualification requirements.

It would be unreasonable to require a company to slow completion of its projects until unqualified Navajos gain sufficient training to become qualified. Construction contracts, particularly, require strict time tables; if work is put on

hold while a company waits for welding applicants to learn how to weld and then to become certified, time and money will be lost. Employers, both non-Navajo and Navajo companies, will become increasingly reluctant to operate on the Navajo Nation, and the purposes of the NPEA will ultimately be frustrated. All that the NPEA requires is that, when there are a number of qualified candidates for a position, a Navajo must be selected over a non-Navajo to fill the position.

Non-Navajo commercial and industrial projects are essential to the prosperity of the Navajo Nation as a whole. The importance of the employment which these businesses provide to members of the Navajo Nation can not be overstated. Accordingly, unreasonable restraints should not be placed on non-Navajo companies who want to do business on the Navajo Nation. To interpret the NPEA as mandating that employers hold positions open until unqualified Navajos become qualified would indeed be an unreasonable restraint. Therefore, we hold that the NPEA does not require employers to hold positions open until unqualified candidates become qualified.

This holding, however, is not determinative of whether the Petitioners were wrongfully denied employment by G&C. The resolution of this issue depends solely upon the particular facts of the case. Having carefully reviewed these facts, we find that although G&C did not violate the NPEA by failing to hold positions open for the Petitioners, G&C did violate the terms of the Settlement Agreement by failing to hire them.

The Settlement Agreement between El Paso Natural Gas and the Navajo Nation, which was joined by G&C prior to beginning work on project 9109, reflected the priorities inherent in the NPEA. Under the contract, G&C agreed,

> not to accept referrals of non-Navajos for work to be performed within the geographical jurisdiction of the Navajo Nation so long as applications of *potentially qualified Navajos* have been received ... [and] not to directly hire non-Navajos so long as qualified Navajos are available. Settlement Agreement; Gregory & Cook, Inc., El Paso Natural Gas Co. and the Navajo Nation - Spread 3 Pipeline Project, January 21, 1992. (emphasis added).

G&C also agreed to "fully comply with Navajo law, including the Navajo Preference in Employment Act (NPEA) in work within the geographical jurisdiction of the Navajo Nation." *Id.*

Although this part of our decision is based on the Settlement Agreement and not on the NPEA,[4] it is helpful to keep both the purposes and the mandate of the NPEA in mind when considering the scope of G&C's obligations under the

---

4. Section 4(A) of the NPEA states that employers doing business within the territorial jurisdiction of the Navajo Nation, or engaged in any contract with the Navajo Nation, must file with the Office of Navajo Labor Relations an affirmative action plan which conforms with the provisions of the Act. The Section further states that "[f]ailure to ... comply with the terms of a conforming plan [here, terms that were set out in the Settlement Agreement] shall constitute a violation of the Act." Thus, by violating the terms of the Settlement Agreement which were designed to conform with the NPEA, G&C did, in fact, violate the NPEA.

Settlement Agreement. The NPEA requires that as long as a qualified Navajo has applied to fill a position, he or she is to be hired even if qualified non-Navajos have applied for the same position. And under the Settlement Agreement, G&C was obligated not to hire non-Navajos as long as the applications of "potentially qualified Navajos [had] been received." Therefore, by hiring non-Navajos for work on project 9109 after the applications of the Petitioners, who were "potentially qualified Navajos," had been received, G&C violated the express terms of the Settlement Agreement. For this reason, the decision of the Commission is affirmed.

G&C has argued extensively that, because each of the Petitioners had previously taken and failed El Paso's required welding test, the Petitioners were not "potentially qualified" candidates when they applied for employment on project 9109. It is true that each of the Petitioners had previously taken and failed the El Paso welding test. However, the crucial fact is they did so before ever applying for employment on project 9109. It is for this reason that G&C's argument must fail.

The Petitioners initially tested for El Paso in 1991. They did not apply for positions on project 9109 until late January, 1992. We believe that it is unreasonable for a company to accept applications and yet deny employment based on welding tests taken before an applicant submitted himself as a candidate for that employment.

If we were to accept the standard of "previous failure to qualify" as determinative of present disqualification for employment, it is uncertain where this would lead. Who would be excluded? Those who failed the test within the past month ? Six months ? One year? Five years? Although a candidate may have previously been found unqualified, the candidate's work on other jobs, or participation in retraining exercises, may serve to qualify the candidate shortly. The present case illustrates this. Although the Petitioners had previously failed the El Paso welding test, each passed the test at the first opportunity after filing his application. The Petitioners' past performances were not indicative of their later qualifications. Therefore, a candidate's qualifications must reasonably be evaluated *after the candidate has applied for a position* in order to determine whether that candidate is, in fact, qualified or unqualified to fill that position.

Under the Settlement Agreement, sole control over the setting of testing dates remained with El Paso and G&C. Both companies had the inherent obligation to ensure that applicants were tested in a timely fashion. Further, it was G&C's obligation to ensure that Petitioners were tested and found to be actually unqualified before hiring non-Navajos for work on project 9109. Yet this did not happen. The Petitioners were not tested and, while their applications with G&C for employment on project 9109 were pending, non-Navajos were hired for that project instead.

Finally, although the Petitioners were eventually tested and found actually qualified to work on project 9109, G&C refused to hire them. G&C has argued that this refusal was justified because all the welding positions on that project had already been filled. However, G&C violated the Settlement Agreement by hiring

non-Navajos to fill these positions while the Petitioners' applications were on file. It would be illogical to allow G&C to violate the terms of its own Agreement and then to use this violation as a basis for denying the Petitioners employment. Accordingly, once the Petitioners became qualified for employment on project 9109, G&C was obligated to hire them. How this was to be accomplished, whether by creating more employment positions, or by displacing non-Navajos, was G&C's decision.

In summary, by hiring non-Navajos to work on project 9109, while the applications of "potentially qualified Navajos" were on file, and by failing to hire the Petitioners for work on project 9109 after they became qualified, G&C violated the terms of the Settlement Agreement to which it was a party. For this reason, the Commission's award of lost earnings to the Petitioners is also affirmed.

### B. The Wage Credit Issue.

To determine the amount of damages awarded to the Petitioners, the Commission calculated the amount of each Petitioner's lost earnings from March 18, 1992, the day they qualified for employment, through May 5, 1992, the day the welding for project 9109 was completed. The Commission found that all welding jobs on project 9109 had the same pay, the same benefits, and generally the same hours. The Commission also found that the welders received standby pay during intervals when the crews were not actually working, and welders working for G&C earned an average of $2,300.00 per week which, for a seven-day week, averaged out to $328.57 per day. G&C has not challenged these findings.

The Commission then found that Gary Miller and Roy Largo had been employed for part of the time at issue. Because an award of lost earnings is intended to compensate only actual loss suffered by the victim, the Commission deducted from Gary Miller's and Roy Largo's awards the amounts that they had actually earned through this other employment. The Commission did not, however, make a finding as to whether Thomas Largo had been employed elsewhere during this time; therefore, the Commission did not deduct the amount of any such wages from his award. G&C argues that Thomas Largo's award should have been deducted because he was employed elsewhere during the time at issue.

The Commission's decision on this issue is reversed and remanded so the Commission can hear evidence to determine whether Thomas Largo's award should be reduced.

### C. The Attorney's Fees Issue.

Although the Commission awarded lost wages to the Petitioners, the Commission neither awarded nor mentioned attorney's fees in its March 15, 1993 decision. The Petitioners then submitted a formal request for attorney's fees. The Commission denied this request on April 19, 1993. The Petitioners

appeal this denial.

The general rule for awarding attorney's fees is set forth in *Yazzie v. Herrick*, 5 Nav. R. 129, 131 (1987).

> The attorney's fees rule within the Navajo Nation is that each party in litigation is responsible for their own attorney's fees.... Recognized exceptions are (1) when a statute provides for attorney's fees...; (2) when a case presents a special set of circumstances...; and (3) if a pleading or document is not submitted in good faith, or it contains material misstatements of fact or law, or is not made upon adequate investigation or research.

Thus, a party must prove that his case is an exception to the rule before he is entitled to attorney's fees.

The Petitioners have not argued that this case presents special circumstances or that either pleadings or documents were not submitted in good faith. The Petitioners may, therefore, be entitled to attorney's fees only if a statute, in this case the NPEA, authorizes such relief.

We have decided this appeal on the basis of the Settlement Agreement and not on the NPEA; to that extent, the NPEA does not provide grounds for awarding attorney's fees. However, the Commission found that G&C violated the NPEA when G&C laid-off Thomas Largo and Gary Miller from an earlier El Paso project.[5] That holding has not been appealed.

Thus, because the NPEA was violated as to Thomas Largo and Gary Miller, these Petitioners may be entitled to attorney's fees under the NPEA. The NPEA was not violated as to Roy Largo, therefore its provisions do not apply to him. Because Roy Largo does not fall within any of the exceptions listed in *Yazzie*, he is responsible for his own attorney's fees. Accordingly, the Commission's denial of attorney's fees to Roy Largo is affirmed.

Thomas Largo and Gary Miller may be awarded attorney's fees only if their case meets the requirements set forth in the NPEA. Section 12 of the NPEA states, "[i]f, following notice and hearing, the Commission finds that respondent has violated the Act, the Commission *shall*: (2) ... award attorney's fees if the respondent's position was not substantially justified." There has been some dispute as to whether the Petitioners' request for fees was timely, whether the Commission correctly applied the "substantially justified" standard, and whether the lack of specific findings by the Commission on the "substantially justified" issue merits reversal. We will now address these concerns.

As quoted, the NPEA requires the Commission to consider awarding attorney's fees whenever a respondent is found to have violated the statute. There is no requirement that a petitioner request this relief before a hearing is held; indeed, a petitioner need not request attorney's fees at all. The Commission is required to make that inquiry on its own. Therefore, the timeliness of the Petitioners' request here is irrelevant.

Section 12 of the NPEA leaves to the Commission the task of evaluating

---

5. Project 9106. *Largo et al. v. Gregory & Cook, Inc.*, NNLC No. 92-006.

whether a respondent's position is "substantially justified." On appeal, our review is limited to determining whether the Commission's decision was arbitrary, capricious, or not supported by the evidence. Only if the decision was clearly an abuse of the Commission's discretion will it be overturned.

Admittedly, because the Commission did not make written findings on the attorney's fees issue, it is difficult to determine how the Commission applied the NPEA's "substantially justified" standard. However, it is evident that the Commission did, in fact, apply the standard at the time it made its initial decision in this case. When the Commission denied the Petitioners' later, written request for fees, it stated that "*[i]n accordance with the Navajo Preference in Employment Act,* ... [and] *based upon the evidence* presented at the hearing by the parties [it found] no cause to *modify"* its decision. (emphasis added). From the language, it is clear that the Commission considered the requirements of the NPEA and decided against awarding attorney's fees at the time of the initial decision. Thus, the Commission did what the statute required it to do.

In matters of agency decisions, we give deference to the agency's interpretation of its laws. The Commission has handled numerous labor cases; in some cases it has awarded fees, and in others it has not. We can not say, as a matter of law, that the Commission's denial of fees to the Petitioners here was arbitrary, capricious, or not supported by the evidence. We expect the Commission to make written findings in future cases; however, a lack of specific findings is not sufficient grounds for reversal in this case. Therefore, because the decision was not clearly an abuse of discretion, the Commission's denial of attorney's fees to Thomas Largo and Gary Miller is also affirmed.